STEBBINS & ROBERTS, INC. *v.* PULASKI GLASS & MIRROR CO.

5-2355                                                    345 S. W. 2d 912

Opinion delivered April 17, 1961.

[Rehearing denied May 29, 1961.]

*Rose, Meek, House, Barron, Nash & Williamson,* for appellant.

*Mehaffy, Smith & Williams* and *B. S. Clark,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant and appellee are corporations organized under the laws of Arkansas. The State Highway Commission invited competitive bids for 40,000 gallons of white, and 40,000 gallons of yellow, highway paint. On June 9, 1960, both companies submitted bids. Appellant submitted a bid of $2.23 per gallon for white paint and $2.39 per gallon for yellow paint, respectively totaling $89,200 and $95,880. Pulaski's bid amounted to $2.19 per gallon for

white paint and $2.31 per gallon for yellow paint, respectively totaling $87,600 and $92,400. Under the provisions of Sections 14-119 and 14-120, Arkansas Statutes, public agencies of the State of Arkansas, in the purchase of commodities on competitive bids, are required to purchase from a resident firm, provided the bid of the resident firm does not exceed by 5% the lower bid of the non-resident firm, and further provided that the former claims the preference at the time of the submission of the bid. Both appellant and appellee claimed the preference, and the contract was awarded to Pulaski on the basis of its lower bid. Thereafter, appellant (which submitted the next lowest bid, and would have received the contract if Pulaski had not also been entitled to a preference) instituted suit in the Pulaski Chancery Court against appellee, the Commissioners of the State Highway Commission, State Comptroller, State Auditor, and State Treasurer, alleging that appellee, insofar as the sale of paint was concerned, did not meet the requirements of Section 14-120 (d),[1] in that it did not have a *bona fide* place of business within the State of Arkansas and had never stocked paint for general sales to the public. The complaint alleged that appellee had entered into an agreement with the William Armstrong Smith Company, "hereinafter referred to as 'Smith Company', a foreign corporation, under the terms of which Smith Company, a manufacturer of paint, will supply to the defendant, Pulaski Glass & Mirror Company, all paint it may sell to a public agency of the State of Arkansas with a view of taking advantage of the performance provided in the statutes above mentioned and dividing the profits derived from such sales." It was further alleged that appellee did not, and has never, maintained a representative inventory of paints, but only maintained a

---

[1]This subsection reads as follows: " 'Firm resident in Arkansas' shall mean any individual, partnership, association, or corporation (whether domestic or foreign), which maintains, at the time of submission of the bid, a bona fide place of business and a representative inventory of the commodities on which the bid is submitted, within the State of Arkansas, and, in the case of corporations, is duly qualified to do business and is in good standing under the laws of the State of **Arkansas.**"

"token" inventory for the purpose of making it appear to be a "firm resident in Arkansas" within the meaning of the statute, and thus entitled to the 5% preference when bids were being competitively compared. Appellant asked that the Highway Commission be enjoined from approving any invoices submitted in connection with the sale by Pulaski Glass & Mirror Company to the Commission, and prayed that the Comptroller, Auditor, and Treasurer be enjoined from approving such invoices or issuing warrants therefor. A temporary injunction was granted, following the filing of an injunction bond by Stebbins & Roberts, Inc., but a stipulation was subsequently entered into permitting the delivery of paint to the Commission by Pulaski, providing, however, *inter alia*, "5. As paint is received by the Commission from Pulaski, it shall deposit in the registry of the court a sum representing the bid price of Pulaski, and Pulaski shall be permitted to withdraw from the sum so deposited 99 per cent of its bid price. 6. If by the decree of the Pulaski Chancery Court, if no appeal is taken, or if by the judgment of the Supreme Court, it is ruled that the bid of Pulaski should not have been accepted by the Commission and that it should have accepted the bid of Stebbins, the State Highway Commission shall pay into the registry of this court the difference between the bid of Pulaski and the bid of Stebbins, and Stebbins shall be paid from the funds deposited in the registry of this court, with respect to each gallon of paint received by the Commission from Pulaski, the difference between the respective bids of Stebbins and Pulaski, and it shall also be paid from the funds deposited in the registry of the court one per cent of the bid price of Pulaski which is withheld pursuant to the provisions of Paragraph 5 above, that amount being the estimated profit of Pulaski which it is not entitled to receive if the acceptance of its bid was in violation of the Statutes of Arkansas." On hearing, the temporary injunction was dissolved, and the complaint dismissed. From such decree of the court, comes this appeal. For reversal, appellant asserts that the trial court erred in declining to hold that Pulaski

Glass & Mirror Company was a mere agent of the William Armstrong Smith Company, and in finding that the company was entitled to claim a statutory preference with respect to the paint sold to the Commission.

The proof before the court consisted of the testimony of J. W. Meredith, Jr., procurement officer for the Highway Commission, C. C. Kress, president and owner of Pulaski, and Walter Skipper, Secretary-treasurer of Stebbins & Roberts. Pulaski has been engaged in business in Little Rock since 1955, selling glassware and mirrors. According to the testimony of Kress, William Armstrong Smith, of Atlanta, Georgia, contacted him by telephone sometime in January, 1960, relative to Pulaski becoming paint distributor for the Smith Company. He was not acquainted with Mr. Smith prior to that time. The conversations continued, off and on, until March, Smith bearing the expense of the telephone calls. According to Kress, he accepted the line in the latter part of March, and identified a letter that he received from Smith on March 23rd. The letter is as follows:

"We are happy to learn that you are willing to act as our paint distributor in the Little Rock area and would like to bid on State of Arkansas Traffic Paint bids as well as the various requirements on maintenance paints.

Our truck will be leaving here Friday and should arrive in Little Rock Sunday afternoon. I have given the truck driver your home 'phone number (MOhawk 6-6053) and when he arrives in town you can come down and let him in.

Enclosed is Dealer's Price List No. 1909 as well as a Suggested Retail Price List. We will give you an additional 15% discount from the prices shown on the Dealer Price List.

We also enclose color cards and pamphlets relative to several of our products.

I trust you will be wanting to order some of these paints in the near future as we develop sales for the colors.

Your initial stock order will consist primarily of white as 80% of the paint sold today is white and most of the painters prefer to tint it on the job.

Included in your shipment is a quantity of plain traffic paint along with the reflectorized traffic paint. The one gallon cans will be helpful to you in demonstration work in the various cities and towns in which you will be working.

There are several body builders in the Little Rock area that will be interested in purchasing aluminum from you. Mr. Caudle of Wonder State Paint Company developed aluminum sales to these body builders. I will try and find out the names of these builders so that you can develop sales on the aluminum.

Looking forward to a mutually profitable relationship with you, I remain

>Very truly yours,
>
>WILLIAM ARMSTRONG SMITH COMPANY
>/s/ William A. Smith, President''

An invoice, dated March 25th, in the amount of $2,235.34, accompanied the shipment, which was sent to Little Rock by truck. The paint was received on consignment, Pulaski to pay the Smith Company as the paint was sold. Kress testified that 20 gallons of paint had been sold out of the original consignment. The testimony reflected that Smith came to Little Rock a few days prior to the making of the bid, which occasions this litigation. A bid bond was filed with the Pulaski bid, and after receiving the contract, a performance bond was filed. These bonds were arranged by Smith, and the premium on the performance bond paid by Smith. Kress testified that he prepared the bid with the assistance of Mr. Smith, after being given a unit price by the latter. He (Kress) then decided how much profit he was going to add. The witness testified that, under his arrangement with Smith, the Pulaski Company would receive the check from the Highway Department, and he would then pay the Smith

Company its bill for the paint. The paint was to be manufactured in Atlanta, and shipped directly from there to the Highway Department. Mr. Kress stated that one of his employees had built shelving in late May to display the new product. Upon being interrogated as to who would pay for the costs of litigation, he replied:

"A. Mr. House, I am going to pay this if it is not exorbitant, and more than I can stand. To date, I don't know how much this is going to be. This represents not only a suit against me, but every businessman in this State who handles an out of State item and I am going to pay everything, but believe me if I can get them to help pay it, I certainly will. I have no idea how far it will go and I may get more than I can stand."

Kress had not advertised as a paint dealer, nor had he added any employees due to the acquisition of the new merchandise.

Walter Skipper, Secretary-treasurer of Stebbins, testified that most paint dealers carry a color line so that the needs of a customer can be serviced in any color or size desired. He stated that most have color mixers, *i.e.,* tubes of various shades are mixed with a white base to arrive at different colors. He stated that the "normal paint dealer" in Little Rock has a paint shaker; likewise, according to his evidence, the ordinary paint dealer in Little Rock carries a line of accessories consisting of brushes, ladders, and painters' tools, which are displayed prominently in the store, and such a dealer has a complete line of flat wall paints, rubber base paints, exterior paints of all types, and carries quarts, pints, and half-pints. He was emphatic in stating that his company does not sell on consignment. On learning that Pulaski had submitted a bid, Skipper went to their place of business. He testified that he found only four cartons of paint stacked in a corner, a couple of drums, but no display at all. He stated that he saw no other paint, though it could have been in the back of the warehouse. Skipper had filed a protest with the Commission, and had requested

one of the Commissioners to make an investigation. Upon viewing pictures of a paint display which had been offered in evidence, Skipper stated that such a display was not in existence at the time he visited the Pulaski store.

Appellant, in its brief, states that this case is not subject to the rule that an affirmance will be ordered where the findings of the Chancellor are not against the preponderance of the testimony, for there is but little dispute in the testimony. This is true, but the evidence is susceptible to more than one interpretation, and we are of the opinion that the question presented (when a dealer is entitled to preference under the statute) is factual, depending upon the circumstances in each particular case. In other words, there is no hard and fast rule which governs the issue in controversy.

Let us review these facts, relied upon by appellant, as establishing its contention that Pulaski was not a *bona fide* paint dealer. We find no significance in the fact that the first contact was made by Smith, rather than the dealer. The proof reflects that the Smith products had formerly been handled by Wonder State Paint Company, an established Little Rock paint dealer. For some reason, not revealed by the record, the relationship between Smith and Wonder State was severed, and we find nothing unusual in a paint manufacturer endeavoring to obtain another distributor for its products. Since appellee was already engaged in selling certain building supplies, the choice seems logical enough. Kress testified that he desired to expand his business, and it seems but natural that the handling of paints would be a proper line to turn to, since glass and paint are frequently handled together.[2] We see nothing unusual in the fact that the telephone was used rather than corresponding by mail, and we daresay that hundreds of businessmen daily use the telephone in expediting their business;

[2] For instance, Pittsburgh Paint & Glass Company is a well known concern that has been engaged in the paint and glass business for many years. Kress also testified that he intended to take on other building products in expanding his business.

neither do we attach significance to the amount of inventory held by Pulaski at the time of the bid—nor to the fact that no additional employees were retained—nor that advertising had not been entered into. After all, the paint business was a *new* line for Pulaski, and it would not be expected to have the materials and supplies on hand, and available to the general public, to the extent offered by an established paint dealer. Kress testified that the matter of the paint bid was entirely new to him, and he felt he had to rely upon someone familiar with the procedure. In other words, the furnishing of the bonds was a service rendered by Smith in helping Pulaski get started. Perhaps this last fact might have significance, except that Pulaski was just commencing in the paint business. We do not feel that appellant's contention is strengthened because the paint was to be prepared and shipped from Atlanta. In fact, Mr. Skipper testified that his company did not have the paint on hand at the time of the bid. This witness testified that his company bought ingredients from 35 or 40 suppliers over the country, and he could not say that the company had all the necessary ingredients to make the 80,000 gallons of paint.[3] He could only testify that the company could have started on the contract. Of course, it would be most unusual if any dealer or distributor had on hand such a large quantity of paint.

Appellant takes the view that the shipment of the paint on consignment is a strong circumstance indicating that Pulaski was no more than an agent. We do not agree. Though, according to Skipper, appellant company has a strict rule against selling on consignment, we think unquestionably that many concerns, at least on occasion, and when dealing with merchants of limited means, do sell on consignment,[4] and this is probably particularly true when a manufacturer is endeavoring to coax some concern into handling its product in a community.

---

[3] Appellant operates both a manufacturing plant and a retail store.
[4] Kress testified that some of his glass was also bought on consignment.

Finally, appellant emphasizes that Kress is to receive a "commission" for handling the paint. Though it bears no particular import, it is interesting to note that the word "commission" was first used at the trial by appellant's counsel. Kress had been called to the witness stand by the opposing party, in fact, all witnesses were placed on the stand by appellant. In examining Kress relative to the amount of the bid, counsel for appellant asked:

"Q. Now, you testified in here—at least, I questioned you about who fixed the final price in the bid which you submitted to the Highway Commission?

A. Yes, sir.

Q. Is any part of this bid yours that you prepared?

A. I determined my profit, yes, sir."

Subsequently, counsel used the term "commission", and then asked the witness:

"Q. And you don't want to reveal what your commission is?

A. No, sir, I certainly don't. It would be very damaging evidence to me.

Q. All right, we won't ask you.

A. In front of my competitor it would be damaging to me."

Further:

"And your part of this[5] will be just for your commission or services here?

A. My percentage of the profit that I feel I am entitled to, yes, sir."

We think it makes little difference as to the term used. The fact remains that before appellee could make a bid, it was necessary that he first ascertain the unit price from the manufacturer; to this, he added his profit, com-

---

[5] Referring to the payment by the Highway Department.

458

mission, mark-up, or whatever term one may choose to use.

We are unable to say that the Chancellor's finding was erroneous.

Affirmed.

McFADDIN, J., dissents; GEORGE ROSE SMITH, J., not participating.